**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**

**CIVIL ACTION NO. 1:24-cv-00037-MR-WCM**

| | |
|---|---|
| **WAYNE K. SMITH SR.**, Individually and as Personal Representative of the Estate of **WAYNE K. SMITH JR.**, deceased,<br><br>**Plaintiff**,<br><br>V.<br><br>**POLK COUNTY,** *et. al.*,<br><br>**Defendants**. | **PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

**COMES NOW PLAINTIFF,** Wayne K. Smith Sr., Individually and as Personal Representative of the Estate of Wayne K. Smith Jr., deceased, (hereinafter "Plaintiff") by and through undersigned counsel, and respectfully responds, pursuant to Rule 56 of the Federal Rule of Civil Procedure, to Defendant Deputy Benjamin Ray Page ("Page") motion for summary judgment.

## I. INTRODUCTION

Defendant seeks judgment on Plaintiff's deliberate indifference to a medical need claim. Page chased Smith Jr. at speeds exceeding 80 miles per hour on a dark, curvy, narrow road. Smith Jr.'s car hit a tree. Page made a cursory approach to the vehicle through heavy smoke and then walked away to converse with- and shoo

away- the only witness. Emergency medical services arrived (16 minutes later) a delay Page caused. Polk County dispatch initially communicated to first responders that the subject was "in custody," and no life-saving measures of any kind were attempted in those critical minutes. These facts preclude Defendant's relief.

## II. FACTS

### A. THE PURSUIT

On February 2, 2021, Page was the night shift supervisor who does not recall the events that led up to the pursuit, except that he was trying to assist another officer on a traffic stop. (BP 85; 7-10). Page left this traffic stop and drove down Chesnee Road which intersects with Poors Ford Road that turns into Prince Road. (BP 85-86: 22-25, 1-4). Here, he allegedly observed Mr. Smith Jr. cross the intersection ahead of him onto Prince Road. (BP 86: 2-6, 21-22). Page was so far away from the intersection that he could not tell if Mr. Smith Jr. ran a stop sign or was in any other way a reckless driver, only that he was "speeding on up Prince Road based on my training and experience." (BP 87: 2-5; 100: 12-17).

Page approached the intersection and turned onto Prince Road to "catch up" and "get a clock on the Defendant's vehicle." (BP 87: 11-14; 99: 6-8). Page reached speeds between 90-110 to catch up to Smith Jr. without utilizing any lights or sirens. (BP 94: 17-19; BP 127: 13-17). Page got within an "eighth of a mile" from Smith. Jr. when he "locked" a speed of 77 mph in a 45 zone, and then initiated a traffic stop for speeding by activating his blue lights and sirens to finish catching up to Mr. Smith Jr. (BP 90: 20-25; 91: 1-14).

Page also claims he observed Mr. Smith Jr. fail to maintain lane control as he went around the curved roads. (BP 99: 11-22). Accordingly, he was close enough to "see that whenever [Smith Jr.] went around a corner, he was not on his designated portion of the highway between the yellow center and white fog line." (BP 100: 21-25). Page saw this infraction merely by observing Smith Jr.'s headlights in the distance because it was dark and the curvy road had no light poles. (BP 101: 1-13). Interestingly, Page later said he did not see Mr. Smith Jr.'s vehicle hit the tree because "it was dark outside." (BP 105: 5-9).

After deciding to initiate the stop with his lights and siren, Page supposedly notified dispatch "as soon as — I had about— I activated my blue lights and realized that he was [and] sirens and realized that he was not stopping." (BP 95: 6-10). "When I noticed [*omitted*] the vehicle was not slowing down, I told dispatch I was attempting 10-61, which is traffic stop. Told them to notify Spartanburg County because we were approaching the state line, didn't know if it would stop." (BP 91: 14-20).

Page realized this pursuit was going to enter South Carolina "about five seconds after it started" but believed his "Continuous Pursuit Jurisdiction" permitted him to unilaterally pursue into South Carolina without any reasonable cross-jurisdictional planning or supervisory authority/notification because Smith Jr. "continued to run into South Carolina." (BP 102: 1-9). Page conceded that this pursuit was primarily in South Carolina, "start[ing] within a mile or less of the state line." (BP 102; 1-13).

This "five seconds" between attempting to catch up while initiating the traffic stop and crossing into SC correlates with Page's call to dispatch. Here, Page told dispatch that he was "attempting a 10-61, State line." (BP Dispatch: 0:01-0:04). Within four seconds, Page notified them that the subject was "going into South Carolina at this time." (BP Dispatch 0:08-0:10). Instead of taking the initiative to inform SC officials (as stated in his deposition), it was dispatch who asked Page if they should notify South Carolina— after Page had already entered South Carolina. (BP Dispatch 0:12-0:14). According to this dispatch call Page gave the "Chase" code of a 10-43 nearly one mile outside of his jurisdiction after passing the intersection of Little Africa Road and Peachtree Road in South Carolina. (BP Dispatch 0:29- 0:37). 13 seconds later, Page notified dispatch that "subject has 10-50'd"— meaning a motor vehicle accident. (BP Dispatch 0:38-0:50). When asked in his deposition when he notified dispatch that he was going into South Carolina, he said "as soon as I stated that I was 10-43, which is initiating a pursuit." (BP 123: 18-23.)

According to Page's incident report, however, the criminal conduct of "Felony-Elude/Flee Arrest w/Motor Vehicle" occurred at the intersection of Prince Road at Shytle Road, in Columbus, NC. (BP Incident Report Pg. 1). Google Maps imagery shows that this intersection is approximately one mile from the state line. Moreover, after this incident, a spokesman for the PCSO said "the deputy chased Smith Jr. for around two miles until he crossed over into South Carolina" and that the deputy notified South Carolina officials, "but they didn't arrive until Smith Jr. crashed." (WYFF Article Pg. 3, ¶2).

There is no record of Page ever initiating a formal pursuit through to his dispatch until after entering South Carolina.

Conveniently, there is no dash camera footage because the new vehicle that Page was issued did not have a dash cam (even though the previous vehicle that he wrecked had one). (BP 81: 17-23). Moreover, no body cam footage has been provided because Page claims he was not issued a bodycam at this time— even though he twice told SCHP Investigators on scene that the events were "not on my body cam" and that it was "not on at the time." (BP 126: 13-17; 127: 2-5).

**B. <u>THE ACCIDENT</u>**

Cody Bolt ("Bolt") was the only other witness to the accident. (CB 27: 2-3; 29: 16). Bolt was about to pull out of his driveway when he saw Smith Jr.'s vehicle coming from his left doing approximately 60 mph. (CB 8: 11-13). According to Bolt, Page was "right behind" Smith Jr., and they were "pretty close together" and "less than 100 yards." (CB 8: 13-15; 24: 3-5). Bolt then curiously followed them as they turned up Ray Blackley Road. (CB 9: 2-10).

Ray Blackley Road is known in the area to be a dangerously small and curvy residential road. Spartanburg dispatch told SCHP dispatch that "there are about 15 curves on Ray Blackley, so I don't know", when trying to describe the location of the accident based on the lack of information given. (Spartanburg Dispatch to SCHP Dispatch 0:57-1:02). Moreover, Corporal George, the SCHP investigator, defined the road as "small; lane and a half… no center line, no nothing." (SCHP Corp. George bodycam 28:30-28:40). Bolt was familiar with the road and knew that a sharp "30-

mile-an-hour curve" laid ahead and that the speeds that Page and Smith Jr. were approaching it at were not safe. (CB 9:10-11; 15: 7-10). In his deposition, Page stated he "knew the road turned right" but continued to press the chase at speeds of 50-60 mph. (BP 104: 22-23; 105: 23). Page also confidently testified that he was familiar with Ray Blackley Road because he "live[d] in the proximity." (BP 102: 20-21). However at the scene, Page told investigators he didn't know the area "that well." (Driggers 4:06-4:13).

Then, "it happened," Smith Jr. "took the curve too sharp, and hit the tree." (CB 9: 13-15). Bolt said it would be "overkill" to estimate that Page was even 100 yards away when Smith Jr. hit the tree. (CB 26: 3-5). Page testified in his deposition that he arrived at the scene "maybe a second" after the crash. (BP 105: 1). Corporal George noticed the lack of skid marks at the scene and opined that Smith Jr. was "probably looking in his rear view mirror"— indicating he was being hotly pursued. (SCHP Corp. George bodycam 36:09).

This is not what Page told South Carolina investigators on scene, however, and he was sure to state in his incident report that he was "1/4 mile" (440 yards) behind Smith Jr. when the wreck occurred. (BP Incident Report Pg. 2; SCHP Incident Form by L/Cpl. Haden Pg. 1). In a recorded interview with L/Cpl. Driggers, Deputy Page repeated this theme three times in less than two minutes, stating he "stayed 1/4 mile behind" before even getting to Little Africa Road (Driggers Audio 3:43-3:52); On Ray Blackley Road he "stayed a good bit of distance because I know the area but I don't know it that well. I stayed about 1/4 mile." (Driggers 4:06-4:13);

After seeing the brake lights and the car hitting the tree, "like I said I was like 1/4 mile or less behind— vehicle stayed in sight distance the entire time." (Driggers 4:22- 4:36).[1] In fact, Page also told PCSO Chief Deputy Jeff Ramsey at the scene that "he was getting to the point that he was losing sight of the vehicle, so he had, I believed he turned his siren off and was about to notify Communications." (JR 71: 20-25; 72: 1-2, 16-22).

What is troubling about the "1/4 mile" reiteration to South Carolina investigators is that Page had spoken to PCSO officials Chief Deputy Ramsey, Sheriff Wright, and the PCSO staff attorney J.J. Sauve prior to giving written or recorded interviews with investigators. (BP 128:24-25; 129: 1-3).[2]

Notably, Page made sure Bolt did not remain on scene to provide a witness report to any investigators and failed to take any statement from him before telling him to "Get out of here" before any other law enforcement arrived. (CB 26: 14). Thus, only Page's depiction of events was provided to investigative staff.

**C. <u>DEPUTY PAGE'S RESPONSE</u>**

Page was on scene within a second (BP 105:1) and got out of his patrol car with his "gun in one hand and a flash light in the other" to approach the wrecked vehicle. (CB 15: 24-25; 16:1). Bolt "[saw] the cop walk to Wayne's driver's side of the car and kind of poked his head in, and turned— you could see on his face it wasn't

[1] Similarly, Deputy Page told L/Cpl. Haden of the SCHP the same line that I was a good 1/4 mile behind him." (L/Cpl. Haden bodycam 3:28-3:34). Furthermore, when asked by Corporal George if he actually saw the crash, Deputy Page said I saw him crash, but like I said, I was back— [up around the curve], yea." (SCHP Corp. George bodycam 20:11–20:22).

[2] Indeed, the staff attorney and Chief Deputy Ramsey are seen hovering at Deputy Page s patrol vehicle window in both SCHP Corporal George s body cam and SCHP L/Cpl. Haden s bodycam when he was being questioned. (See SCHP Corp. George bodycam 18:55; 19:45- 20:30; See also L/Cpl. Haden bodycam 3:15-4:20; 15:20-15:40).

good… He turned around and kind of walked back to his car." (CB 10: 1-8). Cody then told Deputy Page "The car is on fire," for which Page hollered, "get out of here." (CB 16: 12-16; 26: 11-14). Notably, Bolt testified that "if the cop would have said, 'hey, I need a hand,' . . . I'd have helped." (CB 29: 10-13). Bolt said "whatever [Deputy Page] seen in the window wasn't good. It was obvious that Wayne — must have took a hit." (CB 30: 1-6). Bolt never actually saw Smith Jr. in the vehicle, only Page's face after he approached the window. (CB 27: 12-13). For Bolt, this was very familiar: "I— I've personally been in a — a car wreck just real similar to that. Maybe— maybe just speaking from personal experiences." (CB 19: 18-20).

Bolt never saw Page attempt any life-saving aid, including failing to merely check the citizen's pulse. (CB 27: 7-25; 28: 1-4). This is corroborated by Page himself at the scene when he told L/Cpl. Haden "I didn't touch anything." (L/Cpl. Haden bodycam 4:08-4:14). Furthermore, there is no written record of Page checking Smith Jr.'s pulse before informing dispatch that Smith Jr. was "an F-Frank" (See BP Dispatch 1:08-1:10) which ultimately led to EMS being downgraded to a non-emergent status while Smith Jr. helplessly remained in the wrecked vehicle. (PG 41: 1-9). Moreover, when the paramedic, Preston Greene got to the scene, he specifically asked Page if anyone had checked Smith Jr., to which the response was "no." (PG 58: 10-11; 120: 1-6).

Intriguingly, both Page's Responses to the first set of Interrogatories as well as his deposition testimony contradicts himself, Cody, and Preston. Seven times in his IROG response Page made the self-serving statement that he checked Smith

Jr.'s pulse.[3] Similarly, in his deposition, Page distinctly states "after I checked the pulse and figured he was lifeless" (BP 109 22-23); and "I checked his wrist for a distal pulse, he had no pulse." (BP 107: 19-20). When confronted with all prior statements he made about the incident and why this was never mentioned before, he stumbled on his words and had no answer.[4]

According to Preston, if the trauma didn't kill Smith Jr., the time that it took him to receive medical care would have. (PG 72: 18-25; 73: 3-7).

> [I]n my narrative I put specifically that when I arrived on scene and I asked where the subject was, they told me that — initially said he was in custody. He was never in custody. He was in the car the entire time, which I had a lot of questions and I was very frustrated because I asked specifically the officers, I said, then why were we downgraded non-emergent to this call. And then that's when we were given the specifics as we approached the vehicle… There's a lot of communication failures. Which I take everything very personal here, because I feel like we're here to make a difference. I have a lot of frustrations when people don't do their job and communicate, especially when it's someone's life.

PG 46: 6-25.

Page failed to properly notify Spartanburg County with sufficient time and information to reasonably prepare for an obvious consequence of his conduct by engaging in a formal pursuit one mile beyond his jurisdiction. (BP Dispatch 0:29-0:37). Preston emphatically stated the importance of communication in this rural area where resources are scarce and "every minute matters." (PG 80: 5-7; 85: 14-19; 108: 18-22). [5]

---

[3] See Exhibit 13, (D) Response to Irogs Questions: 1, 6, 13, 15, 16, 22.

[4] See BP Deposition 138: 9-12; 155: 2-5; 157: 1-3; 166: 8-16; 167: 5-7.

[5] Preston testified as to what normally happens if EMS and other emergency responders are properly notified of a police chase: "So anytime there's a chase going through a county where there's obviously EMS personnel, but the fact -- the risk of anyone being injured, it's always good to have your units on standby so we are prepared mentally and ready to go in the instance that there is an injury to the -- the subject that's being chased, or a

Here, however, things played out differently. Preston noted there was a 10-15 minute delay in notifying Spartanburg EMS from Polk County, because "Polk County state[d] they thought the patient was dead." (PG 60: 10-21).[6] Preston was "very surprised" once he got on scene to learn there was a fatality and that Smith Jr. was still in the vehicle after being downgraded to non-emergent. (PG 46: 2-5). When asked to explain the difference between emergent and non-emergent, Preston said "It would be like going to a stubbed toe versus a cardiac arrest." (PG 49:1-3).

Preston was en route at 21:04:10 and arrived on scene at 21:17:02— making initial contact with Smith Jr. at 21:18:30. (PG. 37:13; 52: 25; 53: 1). Smith Jr. sat helplessly in his vehicle for at least 14 minutes and 20 seconds before anybody checked to see if he was actually alive. It would have taken minimal effort to check the pulse because even though Smith Jr. was entrapped in the vehicle, his left arm was exposed, which was the first thing Preston checked upon approaching the vehicle. (PG 59: 16-18). Preston pronounced the time of death at 21:20 exactly and notified the coroner. (PG 60: 5-6). Preston's frustrations as to how Page and the PCSO failed to communicate the situation to Spartanburg can be heard on both

passerby, or bystander, or of course if our deputies get hurt. So at -- most systems that -- we would know that. At Spartanburg, any point in time a chase was happening, we would have been notified in general letting us know that that was a situation. So it's very important to know so someone is there. So if a deputy does wreck or the -- a situation like where if the subject isn't wrecked, someone's there within minutes, not several minutes, and time is not really a deciding factor with death, I guess you could say." PG 114: 14-25; 115: 1-7.

[6] Moreover, the communication failures from PCSO were further described as follows: "[P]er my call notes on my narrative it said that the patient -- the subject was in custody, and then we could come non-emergent, the call… I do know that they told us it was a police chase with Polk County, and it was in Spartanburg County, which brought a lot of confusion to me because none of that was ever communicated. And normally our supervisors were very big on the communication part to knowing when something like that was happening so we could all be prepared for that. So it was very weird and strange that we were not made aware what was going on initially." PG. 41-42: 22-25; 1-12.

L/Cpl. Haden's and Corporal George's body cameras. (See L/Cpl Haden bodycam 0:00-1:00; Corp. George bodycam 25:35).

Page never checked Mr. Smith Jr.'s pulse, encouraged EMS be downgraded to non-emergent, and then sat in his vehicle to stay warm because "it was [] a South Carolina Highway Patrol scene, so we stayed out of it." (BP 140: 15-18). In his deposition testimony. Page admitted at least "15-20%" responsibility for the accident based on him "pursuing." (BP 134: 8-22; 135:14-18).

### D. <u>DEPUTY PAGE CREDIBILITY ISSUES</u>

As identified above, there is a web of uncertainties that surround the events leading up to Smith Jr.'s death. Furthermore, and of grave concern, Page's prior conduct in his personnel file establishes that he will to lie to superiors and investigators and provide self-serving and false information to protect himself.

In September 2012, while in phase II of his field training, Page was reprimanded for insubordination for stalking and harassing a female outside of his jurisdiction. (See Exhibit 14, Columbus PD Reprimand Pg. 2). Page was "specifically instructed by [his superior] that under no circumstance was he to make traffic stops" or "issue citations." (Id. at ¶1-2). "Officer Page indicated that he understood and would follow instructions." (Id. at ¶2). Instead, over his next two shifts, Deputy Page engaged in a traffic stop against a female that he knew in a CVS parking lot, and then "followed her for some period, to a point well outside the city limits, and initiat[ed] a traffic stop on the road she lived on." (*Id.* at ¶3). Page's superior received the complaint and confronted Page about the allegations, which he denied

"at least twice"— until ultimately confronted with evidence against him. (*Id*. at ¶4). Furthermore, "of potentially grave consequences," Page failed to notify dispatch that he had stopped a vehicle and provide other vital information that is "crucial" for safety concerns on both of these stops. (Id. at pg. 3, ¶1.) And, similar to the incident with Smith Jr., Page was alone and his vehicle was not equipped with a dash-cam. (*Id*. at ¶2).

Next, after being terminated from the PCSO in 2013 (for reasons unknown), Page was terminated from the Rutherfordton Police Department for conduct unbecoming of an officer. (See Exhibit 15, Rutherfordton Termination). According to the letter of termination from the Chief of Police, Page received a written reprimand for four Policy violations on October 23, 2013, with notice that any of these prior four violations could have resulted in his dismissal. (Id. at pg. 3 number 1). Page failed to heed this advice, and on November 7, 2013 he administered a breath test with faulty equipment, in violation of policy, and then issued a "vindictive" citation when the magistrate released the subject for "No Probable Cause." (Id., number 2 & 3.) Furthermore, when asked by his superior when his "alco-sensor" had been calibrated, Page lied and told him "just the other day"— when in fact it had been over fifty-one days prior. (Id. at Pg. 5 ¶2.) To this day, Page refuses to believe he did anything wrong, and instead asserts his termination was "politically motivated." (BP 26: 5-7).

Thereafter, on November 21, 2013 (not two weeks later), while off duty for the Columbus PD, Page was stopped for speeding 42 mph in a 25 mph zone— and

when confronted by the officer, he denied the speed that was locked on the patrolman's RADAR. (Columbus PD Reprimands, Pg. 1, ¶1). 24 days later, Page was again caught speeding by a patrolman for 60 mph in a 35 zone. (*Id*., at ¶2). Here, Page was "slow to stop" even though the lights and siren were utilized by the officer. (*Id*.) This conduct was deemed "detrimental to the Department and fell well below the expectations." (*Id*.) Page was forced to surrender his badge and department keys and was suspended. (*Id*. at ¶3).

While employed at the Saluda PD, Page made colleagues feel unsafe to the point of a voluntary written statement against him. (See Exhibit 16, Saluda PD Statement). Here, Page showed blatant indifference for the safety of citizens in his hometown. Page was watching "Live PD" when a call from Greenville, SC came on the show. He got up, walked towards the TV, pulled his loaded service pistol out, and pretended to shoot the suspect— at least three separate times. (Saluda PD Statement p. 1).

According to Chief Deputy Ramsey, this type of conduct is acceptable at PCSO, stating that they will hire deputies that have been terminated or separated from other agencies "for reasons that we don't feel interfere with what we're looking for, our standard, our culture, so to speak." (JR 25: 4-10).

**E. <u>WAYNE K. SMITH JR. MEDICATIONS</u>**

There is a weak attempt to smear Smith Jr.'s character by the Defense: "A post-mortem toxicology exam revealed that Smith Jr. had alcohol, oxycodone, and oxymorphone in his system." (See Doc. 65, Page 8). However context is key— and

later in that same Exhibit provided by Defense, it clearly states there was a BAC of 0.03, well below the legal limit and impairment, and "the sources of oxycodone [and oymorphone] are scheduled prescription medications." (JE 70: 2-6; 93: 3-13.) In fact, just a day before he was killed in this pursuit, Smith Jr. received results from a recent doctor's visit, whereby Oxycodone and Oxymorphone were "present and declared for prescription verification" and ultimately "EXPECTED." (See Exhibit 17, MGC Family Medicine, Summary Pg. 3).

## III. STANDARD OF REVIEW

"Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)).

## IV. ARGUMENT

The Supreme Court's application of *Sacramento v. Lewis* provides that the Fourteenth Amendment applies to police chases. *County of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998). Defendant's argument is that there was no duty to provide care, and to the extent there was, Page was not deliberately indifferent because: 1) decedent died upon impact and 2) Page contacted medical providers. Defendant requests qualified immunity. Defendant's Motion should be denied.

### 1. THERE WAS A DUTY TO PROVIDE MEDICAL CARE

Page contends he had no duty to provide medical care to Smith Jr. Defendant stretches the reasoning in *Deshaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189 (1989), in which the Supreme Court addressed if social services had a duty to protect a child from an abusive parent. *Deshaney* focused on

government protection from a privately inflicted harm, not one created by a state actor. *Id*. at 197. *Deshaney* explained that the affirmative duty to provide care does not come from the mere *knowledge* of the predicament, but from the "limitation which it has imposed on his freedom to act on his own behalf." *Id*. at 200. In fact, contrary to Defendant's broad interpretation that *Deshaney* "does not require an affirmative right to governmental aid", (Doc. 65, p.8), the *DeShaney* Court unequivocally restated its decision in *Revere* v. *Mass. General Hospital* that "the Due Process Clause [of the 14th Amendment] requires the responsible government or governmental agency to provide medical care to suspects in police custody who have been injured while being apprehended by the police." *Id*. at 199.

The Fourth Circuit reiterated in *Patten v. Nichols*, that a state actor is obligated "to provide medical care to suspects injured while being apprehended by the police." 274 F.3d 829, 837 (4th Cir. 2001) (citing *City of Revere v. Massachusetts Gen. Hosp*., 463 U.S. 239, 244, (1983)). The question is not whether formal handcuffing occurred, but whether the state's affirmative exercise of power placed Smith Jr. in a position of vulnerability from which he could not protect himself. *See DeShaney,* 489 U.S. at 200 (1989).

Indeed, the apprehension process was fluid. Page pursued Smith Jr. by activating his lights and siren for the explicit purpose of apprehending him. The crash that injured Smith Jr. was the direct result of that pursuit. Smith Jr. did not independently find himself in danger; Page's own pursuit on a dark, curvy road at speeds exceeding 80 miles per hour created the dangerous condition. Smith Jr. was

trapped in a vehicle and incapable of seeking help for himself—precisely the condition that *DeShaney* recognized as triggering a state's duty.

Therefore, when a state actor chases a suspect, the affirmative duty to provide medical care arises when the attempted apprehension comes to an end—regardless of the means to that end. Defendant paints the image that he stumbled upon an accident that occurred without any connection to his conduct. This is a gross twist of reality, as the only witness to the events immediately leading up to the accident saw Page "right behind" the decedent— pressing a high-speed chase down dark and dangerous residential roads, of which Page was aware of the impending dangers. (CB 8: 13-15; 24: 3-5; BP 104: 22-23; 105: 23). Page was likely at the state line to initiate a pursuit. *See* (BP 86:13-15), *compare* (KG 18: 10-20). Unlike the child abused in *DeShaney*, the state actor here both "created" and "caused" the predicament.

Furthermore, *Deshaney* says that "a State may, through its courts and legislatures, impose such affirmative duties of care and protection upon its agents as it wishes." *Deshaney*, at 202. The duty that was owed by Defendant is further informed by N.C. Gen. Stat. § 20-145, which expressly exempts law enforcement from speed limitations during pursuits, but only when exercised "with due regard for safety," and critically, does not shield an officer from "the consequences of a reckless disregard of the safety of others." N.C. Gen. Stat. § 20-145. Therefore, state actors engaging in an apprehension of a suspect must still exercise "due regard for

safety" and if an accident or injury occurs, may still be liable, and have a duty to assist the citizen when they stop to complete the apprehension of the suspect.

Defendant now skirts this duty by claiming there was no custody. (Doc. 65, p.10). Plaintiff disputes this assertion. Defendant relies on *Deshaney* again when it attempts to shrink the definition of "custody" under the Fourteenth Amendment to require a physical connection. (Doc. 65, p. 9-10). However the full quote captures the breadth of the Supreme Court's understanding that "it is the State's affirmative act of restraining the individual's freedom to act on his own behalf -- through incarceration, institutionalization, or other similar restraint of personal liberty -- which is the "deprivation of liberty" triggering the protections of the Due Process Clause." *Deshaney*, at 200.

More importantly, if decedent was in custody is not clear. The record further reflects that Polk County itself communicated to first responders that Smith Jr. was "in custody." Audio recordings from 911 dispatch and Cooley Springs Fire Department communications indicate that Mr. Smith Jr. was initially reported as being "in custody." This "in custody" communication from Page's own agency is direct evidence that, from law enforcement's own perspective, Smith Jr. was in a post-apprehension state. Defendants cannot simultaneously argue that Smith Jr. was never in custody while their own dispatch communicated to first responders that he was. At minimum, this creates a genuine dispute of material fact on the custody question that precludes summary judgment.

The Supreme Court's decision in *Collins v. City of Harker Heights*, 503 U.S. 115 (1992), and its progeny underscore that Smith Jr. is owed a duty under the Fourteenth Amendment. In *Slaughter v. Mayor of Baltimore*, the Fourth Circuit reasoned that a state actor has an obligation "to take care of those who have already been deprived of their liberty—such as pretrial detainees, persons in mental institutions, convicted felons, and persons under arrest." *Slaughter v. Mayor of Baltimore*, 682 F.3d 317, 321 (4th Cir. 2012) (citing *Collins*, 503 U.S. at 127).

Courts hold that the *Collins* list is not exclusive. The *Slaughter Court* was tasked with determining whether an employee was technically in custody for purposes of the Fourteenth Amendment when he died during a training session at the Fire Department; he was. In *Waybright v. Frederick County*, 528 F.3d 199 (4th Cir. 2008), a recruit who died during a training exercise was owed a duty. *Id*. at 208-09. The district court in *Smith v. City of Greensboro* pointedly state that "[t]he common feature of that (non-exhaustive) [*Collins'*] list is that, in each instance, there has been some 'restraint of personal liberty,' not that the restraint lasted for any specified period of time." *Smith v. City of Greensboro*, 2020 U.S. Dist. LEXIS 53132, *46, 2020 WL 1452114 (M.D. NC 2020).

Here, custody is clearly stated. Deputy Page initiated a traffic pursuit at high speeds and continued the pursuit and apprehension after the accident when he approached Mr. Smith Jr. with his weapon drawn and flashlight. Even if the actual pursuit is deemed to lack the necessary elements of restraint, Smith Jr. was in custody under the meaning of the Fourteenth Amendment when the law

enforcement officer approached with obvious intent to apprehend that resulted from a law enforcement encounter. There is no physical requirement, nor is there a length of time requirement to find custody occurred. But rather, it is an "affirmative act" restraining ones' ability to act on their own behalf. *Id*. a*t* *46.

Defendant's citation to unpublished persuasive authority from other federal districts is not dispositive. Each case can be distinguished.

First, Defendant cites *Crenshaw v. Anderson*, an unpublished opinion from the Northern District of Texas. (See Doc. 65, p. 11). In *Crenshaw*, the Officers engaged in a "show of authority" when they flashed lights and sirens in an attempt to stop the driver, but then turned off their lights and sirens and just followed the Plaintiff. *Crenshaw v. Anderson*, 2025 U.S. Dist. LEXIS 41531, *2. Moreover, the Officers did not stop and thus had no intention of detaining the Plaintiff when the accident occurred. *Id*. at *3. Here, it is undisputed that Page pursued beyond his jurisdiction for the majority of (if not entirety of) the chase against Mr. Smith Jr. (BP 102; 1-13). Moreover, according to Page, he was still actively engaged in a pursuit with lights and sirens with no intention of allowing Smith Jr. to escape detention and arrest when the vehicle hit the tree. (BP 105:1; See also CB 26:3-5). Unlike the Officers in *Crenshaw*, Page approached the vehicle with his gun drawn—with full intent to further restrain Smith Jr. (CB 15: 24-25; 16:1).

Similarly, Defendant invokes *Mitchell v. Savage*. There, the officer was acting upon a county-wide dispatch regarding property damage caused by a vehicle. *Mitchell v. Savage*, 2024 U.S. Dist. LEXIS 182649, *2 (E.D. Kentucky 2024). No

such public emergency or dispatch communications existed here— instead it was an alleged traffic violation. (BP 90: 20-25; 91: 1-14). Like *Crenshaw*, the officer in *Mitchell* left the scene and did not attempt to restrain the driver. *Mitchell,* at *2.

Both cases involved officers who were distant from the crash and did not affirmatively downgrade emergency response or communicate that the subject was in custody. Neither involved a situation where the pursuing officer was the first officer at the scene, own agency reported the subject as being "in custody," or where the officer actively discouraged witnesses from remaining at the scene.

There was sufficient restraint against Smith Jr's freedom to act on his own behalf to have invoked Page's duty to render aid under the Fourteenth Amendment.

**2. PAGE WAS DELIBERATELY INDIFFERENT TO DECEDENT'S MEDICAL NEEDS**

Defendant's contend that Page acted objectively reasonable because: 1) decedent was dead and resuscitation useless and 2) he contacted medical assistance after arriving at the scene. *Short v. Hartman,* 87 F.4th 593 (4th Cir. 2023) controls.

**A. There is no clear evidence that Mr. Smith Jr. was dead and efforts to assist would have been futile.**

The communications record demonstrates that the situation was described not as death but as "in custody". See *supra* at 23. The time between the crash (9:04 p.m.) and the time death was pronounced (9:20 p.m.). This is a sixteen (16) minute window during which medical treatment and intervention could made a difference, and during which Page was present with no life-saving measures were taken.

The evidence Defendants marshal to show death "on impact" largely comes from witnesses who arrived after Page. Greene arrived sixteen (16) minutes after the crash and testified that "so much time went by there that it's -- it's really hard

to say" if Smith Jr. died on impact. (PG 69-70). Erivn was notified of death at 9:21 p.m., and did not arrive on the scene until 11:32 p.m. (Spartanburg County Coroner's Office Report); she provided no testimony related to death on impact. The question for the jury is what Page knew or should have known during that window—not what others concluded after the fact. Bolt recognized the severity of the impact but never saw Smith Jr. in the vehicle. (CB 27: 12-13).

Page did not conduct any meaningful medical assessment when he arrived. By his own account in his initial investigative interview, he "couldn't really see anything because there was a lot of smoke", (BP 121: 8-10), and when he approached the driver's side, he concluded "obviously, the body looked deceased". (BP 122: 6-7). This assessment—made through smoke, with weapon in hand, within seconds of arriving—is not the kind of definitive determination of death that courts have found sufficient to defeat a deliberate indifference claim. The cases Defendant cites involved trained officers who observed multiple recognized signs of death, such as blue discoloration of extremities, cool body temperature, and absence of pulse. Peering through smoke to conclude death is "obvious" without conducting a systematic assessment is neither analogous nor reasonable.

Furthermore, it is objectively obvious that a person who was just involved in a car accident that is merely "slumped" may not be dead and instead is in dire need of medical attention. Page had the ability to check the pulse and assess whether he could assist the detainee, but deliberately chose not to. (L/Cpl. Haden bodycam 4:08-4:14). Moreover, Page is not credible. See *infra*, at 27).

Moreover, Plaintiff has been deprived of the ability to reconstruct the accident and is forced to rely on the self-serving and coached Page statements (who has a history of lying) along with a SC Investigative report that was initiated to solely determine whether contact between the vehicles occurred. (See Doc. 65, p. 10; See also Plaintiff's Spoliation Motion Doc. 68). There is no dash cam nor training records, and Page failed to turn on his bodycam.

Defendant's litany of persuasive authority in which an officer found a person obviously dead as analogous to this incident is misplaced. (See Doc. 65, p. 14-16). These cases are not on point. Succinctly stated, Smith Jr. was not an obvious death to the extremes stated in these cited cases. He was merely "slumped" to the side seconds after an accident, not hanging from an object for thirty minutes with poor color while being cool to the touch. (See Doc. 65, p. 14). In fact, it is telling that just by reading Defendant's motion, all of these officers did more than Deputy Page did in this scenario— they felt for a pulse, checked signs of respiration, felt if the bodies were "cool to the touch" and so on. (See Doc. 65, p. 14-16.)

Furthermore, the *Reed v. Woodruff County, Arkansas,* case cited by Defendant explicitly states that "[The Plaintiff has not] provided any additional evidence or pointed to any facts already in the record which put [Defendant's] credibility in issue." (Doc. 65, p. 14-15). Here, credibility is a cornerstone issue. And, there is no undisputed evidence that Smith Jr. was 'obviously' dead. Page has lied to superiors in the past to cover up his wrongdoing (See Section D of Facts); and the facts surrounding this accident show Page engaged in similar tactics. Page lied

about where the formal pursuit began, he lied to his Chief Deputy about disengaging the pursuit, he lied about properly notifying South Carolina in a timely manner, he repeatedly lied about being "1/4 mile" behind, and he lied on Interrogatories about checking a pulse.[7] —Page lacks all credibility.

Finally, Defendant provides a summary of the above-stated cases in *Hearst v. Mason*— which provides: "these cases suggest that a claim for failing to [render aid] will not lie if the evidence indicates the [detainee] had been deceased for a considerable amount of time or other signs reasonably point to the conclusion that resuscitation efforts [would be futile]." (Doc. 65, p.16)( citing *Hearst v. Mason*, 2014 U.S. Dist. LEXIS 37917, *2, 2014 LX 77827 (WD Penn 2014). Here, there was no considerable amount of time, as Page was by his own words was there within a second. (BP 105:1) Furthermore, the only sign of "lifelessness" in the split-second look that Page made. (BP 107: 18-19). The fact he was entrapped in his vehicle aids in the obvious need for medical assistance.

**B. Deputy Page failed to discharge his duty.**

Defendant maintains that even if Smith Jr. was not dead, he discharged his duty by "promptly summoning the necessary medical help." (Doc. 65, p.16). Page gave the formal "ten-code" for a pursuit more than a mile outside his own jurisdiction without giving any relevant information to his dispatch to provide to South Carolina beforehand. (BP Dispatch 0:29- 0:37). No cause for stop, no vehicle

[7] See the following references and Exhibits for a non-exhaustive list: BP Dispatch 0:29- 0:37; BP 123: 18-23; JR 71: 20-25; 72: 1-2, 16-22; BP Incident Report Pg. 2; SCHP Incident Form by L/Cpl. Haden Pg. 1; Driggers Audio 3:43-3:52, 4:06-4:13, 4:22- 4:36; L/Cpl. Haden bodycam 3:28-3:34; SCHP Corp. George bodycam 20:11–20:22; (D) Response to Irogs Questions: 1, 6, 13, 15, 16, 22; BP 109 22-23; BP 107: 19-20).

description, no license plate— nothing. Page provided the wrong fire district, failed to provide an exact location of the accident, failed to provide a cause of stop, and did not provide Spartanburg with sufficient preparation to assist in a cross-jurisdictional pursuit. Page told his dispatch that the subject was dead without even checking (BP Dispatch 1:08-1:10) — which caused a 16-minute delay in the emergency services being rendered and ultimately being downgraded to non-emergent. (BP 107: 18-19; PG 60: 10-21). The area of pursuit is rural and known to lack sufficient resources to assist. (PG 80: 5-7; 85: 14-19; 108: 18-22). There was no regard for safety, and Page shrugged off the idea that he needed to factor in the safety of the driver: "They're the ones that run." (BP 66: 1-2). Page never gave Greene a "fair" "chance" to save Smith Jr. (PG 85: 14-19; 105; 18-25; 107: 4-11).

The promptness is directly in contention here— from the original notice of a formal pursuit beyond his jurisdiction, to encouraging the downgrading of emergency services, Page failed to reasonably discharge his duty. (See Plaintiff's Expert Report). Defendant's citation to *Maddox*, *Tagstrom*, *Tatum*, *Rich*, and *Teasley* all have the same fatal flaw: care was rendered belatedly. Page approached with his weapon drawn and made a brief observation. Page turned away from Smith Jr.'s vehicle and walked toward Bolt. Under the objective deliberate indifference standard, a reasonable officer would not have abandoned a crash victim to speak with a bystander before conducting even a basic medical assessment.

The other fatal flaw is that Defendant's authority is not within this jurisdiction. Here, "claim[s] of deliberate indifference to a serious medical need, and

the possible defense of qualified immunity, would require factual determinations . . . ." *Nelson v. Guilford Cnty*., 2024 U.S. Dist. LEXIS 29591 (M.D. NC 2024). In *Estate of Riopedre v. United States*, the district court submitted several factual questions to the jury, including if the decedent was still alive when help was called and exhibited signs that the state actor knew of- but yet disregarded- the risk and if 28 to 30 minutes was too long a delay to respond. 2014 U.S. Dist. LEXIS 181742, *26.

**3. BEN PAGE IS NOT ENTITLED TO QUALIFIED IMMUNITY**

Page claims that he is entitled to qualified immunity. He is not. Defendant violated a clearly constitutional right of Plaintiff when he deliberately failed to administer care. Plaintiff presents evidence from which a jury could infer Page subjectively knew Smith Jr. might be alive and in need of medical attention. *Supra*, 24-25; (PG 58: 1-15). *Mays v. Sprinkle,* 992 F.3d 295 (4th Cir. 2021).

**B. CLAIMS AGAINST AUTO OWNERS**

Auto Owners was added as a necessary nominal party under state statutory law that requires the naming of a surety. Plaintiff has an outstanding motion to amend that includes state-law claims to which the surety is required.

## V. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court **DENY** Defendant's Motion.

Respectfully submitted this 28th day of May, 2026.

*/s/ Sharika M. Robinson*

SHARIKA M. ROBINSON
North Carolina Bar No. 44750
The Law Offices of Sharika M. Robinson, PLLC

10230 Berkeley Place Drive, Suite 220
Charlotte, North Carolina 28262
Telephone: (704) 561-6772
Facsimile: (704) 561-6773
Email: srobinson@sharikamrobinsonlaw.com

*Counsel for Plaintiff*

*/s/ Daniel W. Dahnke*

DANIEL W. DAHNKE,
North Carolina Bar No.: 63859
DANIEL W. DAHNKE ATTORNEY AT LAW, PLLC
35 Fairway Lane, Ext.,
Spruce Pine, NC 28777
Telephone: (828) 520-1061
daniel@dwdattorney.com
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2026, the foregoing was filed with the Clerk of Court using the court's CM/ECF system, which will send electronic notice to all counsel of record, as follows:

Sean F. Perrin, Partner
Womble Bond Dickinson (US) LLP
301 S. College Street, Suite 3500
Charlotte, NC 28202-6050
Telephone: (704) 331-4992
sean.Perrin@wbd-us.com
*Attorney for Defendants*

This, 28th day of May, 2026.

*/s/Sharika M. Robinson*
SHARIKA M. ROBINSON
North Carolina Bar No.: 44750
The Law Offices of Sharika M. Robinson, PLLC

10230 Berkeley Place Drive, Suite 220
Charlotte, NC 28262
Telephone: (704) 561 6771
Telefax: (704) 561-6773
srobinson@sharikamrobinsonlaw.com
*Counsel for Plaintiff*

## CERTIFICATION

Pursuant to the Standing Order of this Court entered June 18, 2024, and published to the Bar of the Western District on June 27, 2024, the undersigned hereby certifies:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;
2. Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Respectfully submitted, this, 28th day of May, 2026.

*/s/Sharika M. Robinson*
SHARIKA M. ROBINSON
North Carolina Bar No.: 44750
The Law Offices of Sharika M. Robinson, PLLC
10230 Berkeley Place Drive, Suite 220
Charlotte, NC 28262
Telephone: (704) 561 6771
Telefax: (704) 561-6773
srobinson@sharikamrobinsonlaw.com

*Counsel for Plaintiff*