# THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## ASHEVILLE DIVISION
## CIVIL CASE NO. 1:24-cv-00037-MR-WCM

| | | |
|---|---|---|
| WAYNE K. SMITH, SR., Individually and as Personal Representative of the Estate of Wayne K. Smith, Jr., deceased, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | **MEMORANDUM OF DECISION AND ORDER** |
| POLK COUNTY, et al., | ) ) | |
| Defendants. | ) ) ) | |

**THIS MATTER** is before the Court on the Defendants' Motion for Summary Judgment [Doc. 64], the Plaintiff's Motion for Sanctions Against Non-Party North Carolina Criminal Justice Education and Training Standards Commission and for Fees for Destruction of Evidence [Doc. 61], and the Plaintiff's Motion for Sanctions Against Polk County and Ben Page and for Fees for Destruction of Evidence [Doc. 68].

## I.  PROCEDURAL BACKGROUND

This action arises from the circumstances surrounding the death of Wayne K. Smith, Jr.  On February 2, 2024, the Plaintiff Wayne K. Smith, Sr., individually and as the personal representative of the Decedent, initiated this

action asserting various constitutional violations pursuant to 42 U.S.C. § 1983, violation of 42 U.S.C. § 1981, and claims for wrongful death, battery, false imprisonment, intentional infliction of emotional distress, negligent infliction of emotional distress, and punitive damages. [Doc. 1]. The Plaintiff filed an Amended Complaint asserting the same claims on February 12, 2024. [Doc. 4]. The Defendants filed a Motion to Dismiss on April 24, 2024. [Doc. 6].

On January 13, 2025, the Magistrate Judge filed a Memorandum and Recommendation ("M&R") recommending that the Defendants' Motion to Dismiss be granted as to all claims against Polk County, Sheriff Timothy Wright, and Deputy Ben Page except for the Plaintiff's § 1983 claim against Defendant Page in his individual capacity based on deliberate indifference to the Decedent's serious medical need and the Plaintiff's corresponding claim for punitive damages. [Doc. 10]. On April 7, 2025, the Court overruled the Plaintiff's objections and accepted the M&R in full.[1] [Doc. 14]. On June

---

[1] The M&R also recommended that the Plaintiff be directed to show cause as to why his claims against the only other remaining Defendant, Western Surety Company, which had not yet been served, should not be dismissed. [Doc. 10 at 2 n.1, 23-24]. After the Court accepted the M&R, the Magistrate Judge granted the Plaintiff leave to amend his complaint for the sole purpose of replacing Western Surety Company with a different surety. [Doc. 22]. On May 20, 2025, the Plaintiff filed a Second Amended Complaint substituting Auto-Owners Insurance Company ("Auto-Owners") for Western Surety Company as the Defendant surety in this matter. [Doc. 23]. Although the Second Amended Complaint restates the previously dismissed claims, it is undisputed that the Second Amended Complaint did not revive any of the previously dismissed claims or

2

3, 2026, the Court denied the Plaintiff's motion to reconsider the April 7, 2025 Order and for leave to file a Third Amended Complaint. [Doc. 98].

The Plaintiff has filed two motions for sanctions based on spoliation. One of these seeks sanctions against the North Carolina Criminal Justice Education and Training Standards Commission ("Commission"), which is not a party in this action. [Doc. 61]. The other seeks sanctions against the remaining Defendant Page, but also against Polk County, which is no longer a defendant. [Doc. 68]. Both motions have been fully briefed. [Docs. 61, 68, 86, 89, 95, 99, 104, 108]. On May 14, 2026, the Defendants Page and Auto-Owners moved for summary judgment. [Doc. 64]. The Plaintiff filed a Response on May 28, 2026, [Doc. 90], and the Defendants filed a Reply on June 4, 2026, [Doc. 101]. Accordingly, this matter is now ripe for adjudication.

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict

---

assert any new claims. As a result, there is no claim pending against Defendant Auto-Owners. Rather, the Plaintiff alleges that Defendant Auto-Owners is the surety on Defendant Page's bond. [Id. at ¶¶ 12-14].

for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. <u>Id.</u> When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. <u>Id.</u> at 255. However, courts "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." <u>Eastern Shore Mkt. Inc. v. J.D. Assocs., LLP</u>, 213 F.3d 175, 180 (4th Cir. 2000).

## III.  FACTUAL BACKGROUND

Viewing the forecast of evidence in the light most favorable to the Plaintiff, the following is a recitation of the relevant facts.

On February 2, 2021, Defendant Ben Page, a deputy with the Polk County Sheriff's Office, was on patrol on Chesnee Road in Polk County, North Carolina, when he observed a vehicle speeding through the intersection of Chesnee Road and Prince Road. [Doc. 91-1 at 85-88]. Defendant Page turned onto Prince Road and began pursuing the vehicle, which was later determined to be driven by the Decedent. [Id. at 87-88]. While pursuing the Decedent, Defendant Page used his radar to clock the Decedent's speed at 77 miles per hour on a stretch of road where the speed limit was 45 miles per hour. [Id. at 89]. Upon clocking the Decedent's speed,

4

Defendant Page decided to initiate a traffic stop, so he activated his blue lights and sirens and began trying to catch up to the Decedent's vehicle. [Id. at 92]. The Decedent continued on Prince Road toward the South Carolina border, and Defendant Page told his dispatch that he was attempting a traffic stop near the state line. [Id.]; see also [Doc. 105: Ex. 2. Ben Page Call to Dispatch at 00:01-00:03]. Defendant Page then told his dispatch that he was "going into South Carolina" and told dispatch to notify the South Carolina authorities. [Doc. 105: Ex. 2. Ben Page Call to Dispatch at 00:07-00:16]. Defendant Page observed the Decedent run a stop sign at Peachtree Road in South Carolina, continue speeding, and turn onto Ray Blackley Road, also in South Carolina. [Id. at 00:018-00:44]. At a curve in Ray Blackley Road, the Decedent's vehicle collided with a tree. [Doc. 91-1 at 93, 105]. Defendant Page did not witness the collision, but he arrived at the scene almost immediately after it occurred. [Id. at 106-07]. Upon arriving at the scene, Defendant Page immediately informed his dispatch that there had been an accident, told dispatch to call the fire department, and stated that there was "going to be an F-Frank."[2] [Doc. 105: Ex. 2. Ben Page Call to Dispatch].

---

[2] The Plaintiff makes much of Defendant Page's statement that there was an "F-Frank," contending that Page's statement "led to EMS being downgraded to a non-emergent status while Smith Jr. helplessly remained in the wrecked vehicle." [Doc. 90 at 8]. Neither

Defendant Page initially approached the Decedent's vehicle on the driver's side but could not see or access the Decedent well on that side due to the nature of the crash and the deployed airbag. [Doc. 91-1 at 108]. Defendant Page then proceeded to the passenger's side of the vehicle and saw that the Decedent appeared to be lifeless.[3] [Id.]. Defendant Page did not attempt to render medical aid to the Decedent, and neither the collision nor Defendant Page's initial approach to the vehicle was recorded on video.

The next person to arrive at the scene of the collision was Cody Bolt, who lived nearby and was driving in the area at the time. [Doc. 94-1 at 9-10]. Mr. Bolt pulled up behind Defendant Page's vehicle, saw Defendant Page look into the Decedent's vehicle, and "assume[d] death was apparent, judging by [Defendant Page's] reaction." [Id. at 10, 17]. Mr. Bolt told Defendant Page that the Decedent's vehicle was on fire before making a U-

---

the Plaintiff nor the Defendant explains the meaning of "F-Frank," so the Court is left to surmise that the phrase indicates the presence of a fatality. Regardless, there is no forecast of evidence that Defendant Page's use of the phrase "F-Frank" resulted in the non-emergent status of emergency medical services. Instead, the deposition testimony of the paramedic who responded to the scene indicates that emergency medical services "were downgraded non-emergent traffic *by one of the fire departments*." [Doc. 91-6 at 42]; see also [id. at 83 (attributing the downgrading to Cooley Springs Fire Department)].

[3] In his interrogatory responses and deposition, Defendant Page testified that, upon accessing the vehicle from the passenger's side, he checked the Decedent for a distal pulse and found no pulse. [Doc. 91-1 at 108; Doc. 91-7 at 2, 5, 7]. The Plaintiff disputes this assertion on grounds that Defendant Page did not mention checking for a distal pulse in the statements he gave on the night of the accident. [Doc. 90 at 8-9]. The absence of contemporaneous evidence that Defendant Page checked for a pulse, however, is not itself evidence that Defendant Page did not check for a pulse.

6

turn and leaving the scene. [Id. at 10-11]. Mr. Bolt was at the scene for less than a minute in total. [Id. at 18, 27-28]. Shortly thereafter, Defendant Page extinguished the fire on the Decedent's vehicle. [Doc. 91-1 at 123].

The Decedent was subsequently pronounced dead at the scene. [Doc. 91-4 at 5]. Because the accident occurred in South Carolina, Spartanburg County EMS responded to the accident. [Id.]. Spartanburg County EMS reported that the frame of the Decedent's vehicle had been pushed all the way into the vehicle's cabin, and that the front left tire and wheel were at the Decedent's face. [Id.]. The Decedent had suffered serious trauma to his entire body, and the Decedent's body was trapped in the vehicle. [Id.]. EMS personnel were unable to use their cardiac monitor due to the positioning of the Decedent's body, but they were able to determine that the Decedent did not have a pulse. [Id.; Doc. 91-6 at 60]. The Spartanburg County paramedic who responded to the scene concluded that, in his "professional opinion," the Decedent "was dead on impact." [Doc. 91-6 at 71]. The paramedic further concluded that, due to the manner in which the Decedent was trapped in the vehicle, there was nothing the paramedic could have done to render immediate life-saving aid to the Decedent even if the Decedent had been alive when the paramedic arrived on the scene. [Id. at 80-82]. The fire

department eventually had to cut open the Decedent's vehicle for the Decedent's body to be extricated.  [Id. at 87-91; Doc. 91-1 at 140-41].

## IV.   DISCUSSION

In Shaw v. Foreman, No. 24-7015, 2026 WL 159766 (4th Cir. June 4, 2026), the Fourth Circuit recently held that when the evidence at issue in a motion for sanctions based on spoliation is significant to the merits of an issue, a district court may abuse its discretion "by granting summary judgment without considering the sanctions motion."  Id. at *3.  In light of Shaw, the Court herein considers the Plaintiff's motions for sanctions based on spoliation before proceeding to consider the Defendant's motion for summary judgment.

### A.   Motions for Sanctions[4]

"Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending

---

[4] As a preliminary matter, the Court notes that the Plaintiff's counsel has failed to show proper conferral or attempt to confer regarding both pending motions for sanctions. LCvR 7.1(b); see [Docs. 61, 68]; see also [Doc. 86 at 2, 9 n.1 (contending that counsel for the Plaintiff "ignore[ed] meet and confer overtures" and failed to engage in a meet and confer requested by the Commission prior to filing the instant motion); Doc. 89 at 1-2 (representing that counsel for the "Plaintiff did not make any attempt to consult with the Responding Parties prior to filing this motion")].  While the Plaintiff's motion for sanctions against the Commission mentions prior conferrals with the Commission about discovery, [Doc. 61-1 at 8-10], it gives no indication that the Plaintiff conferred with the Commission about the motion for sanctions itself.  "A motion that fails to show that the parties have properly conferred or attempted to confer may be summarily denied."  LCvR 7.1(b).  Although the Court could deny the Plaintiff's motions for sanctions for failure to confer, the Court will nevertheless address the motions on the merits.

or reasonably foreseeable litigation." Silvestri v. General Motors Corp., 271 F.3d 583, 590 (4th Cir. 2001) (citations omitted). The spoliation of evidence may give rise to court-imposed sanctions deriving from a court's inherent power to control the judicial process and litigation. Id. A court may, for instance, order dismissal, grant summary judgment, or permit an adverse evidentiary inference drawn against a party who destroys relevant evidence, to "level the evidentiary playing field and for the purpose of sanctioning improper conduct." Hartford Ins. Co. of Midwest v. Am. Auto. Sprinkler Sys., Inc., 23 F.Supp.2d 623, 626 (D. Md. 1998) (quoting Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 156 (4th Cir. 1995)). However, "acts of spoliation do not themselves give rise in civil cases to substantive claims or defenses." Silvestri, 271 F.3d at 590.

A party seeking sanctions for spoliation must prove the following elements:

> (1) [T]he party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind;" and (3) the evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.

Goodman v. Praxair Services, Inc., 632 F. Supp. 2d 494, 509 (2009) (quoting Thompson v. U.S. Dep't of Housing & Urban Dev., 219 F.R.D. 93, 100 (D. Md. 2003)).

### 1.   Motion for Sanctions Against the Commission

On March 27, 2026—less than a month before the April 23, 2026 discovery deadline then in place—the Plaintiff served a Rule 45 subpoena on the Commission commanding production of all Commission records pertaining to Defendant Page by April 17, 2026.  [Doc. 86-1 at 10].  The Plaintiff specifically requested nine types of records: (1) "Certification Records," (2) "Affidavits of Separation and Separation-Related Records," (3) "Training Records," (4) "Personal History Statements and Background Materials," (5) "Medical and Psychological Screening Records," (6) "Certification Investigations and Disciplinary Records," (7) "Agency Transfer and Appointment Records," (8) "Communications," and (9) "Commission Policies."  [Id. at 10-11].

On April 8, 2026, the Commission objected to the subpoena on grounds that it requested privileged personnel records.  [Doc. 61-12].  On April 13, 2026, four days before the April 17, 2026 deadline for production pursuant to the Rule 45 subpoena, the Plaintiff filed a motion to compel production of the records.  [Doc. 47].  On April 16, 2026, the Commission

produced 1,502 pages of documents that were not subject to the Commission's written objection. [Doc. 61-2]. On April 19, 2026, the Plaintiff and the Commission filed a consent motion for a protective order regarding the personnel files, and the Plaintiff withdrew his motion to compel. [Docs. 49, 50]. On April 22, 2026, upon consent motion of the parties, the Court extended the discovery deadline through and including May 4, 2026. [Text-Only Order entered April 22, 2026]. On April 23, 2026, the Commission produced additional documents. [Doc. 61-4].

On April 27, 2026, counsel for the Plaintiff emailed counsel for the Commission requesting supplementation of the Commission's production, on grounds that the Commission's production improperly failed to include Affidavits of Separation, also known as Forms F-5B, and other separation-related documents pertaining to Defendant Page. [Doc. 61-6 at 2]. On April 28, 2026, counsel for the Commission replied and offered to meet with counsel for the Plaintiff to discuss the issue, but counsel for the Plaintiff requested a written response instead. [Doc. 61-5 at 1-2]. On April 29, 2026, counsel for the Commission provided a written response stating that "all responsive documents that have been located . . . have been provided," and that no Form F-5B for Defendant Page had been found within the Commission's records. [Doc. 61-6 at 1]. Counsel for the Commission further

explained that, because Defendant Page had been separated from law enforcement positions certified by the Commission since 2019, the Commission believed that any law enforcement certification file for Defendant Page would have been destroyed pursuant to the Commission's routine retention schedule. [Id.]. Because the Commission did not have a "destruction log," however, the Commission could not confirm that there were any such records that were destroyed. [Id.].

On May 8, 2026, the Plaintiff filed the instant motion for sanctions based on the Commission's purported destruction of law enforcement certification records pertaining to Defendant Page. [Doc. 61 at 2, 4; Doc. 61-1 at 3-7]. The Plaintiff, however, concedes that he received a copy of the one form his counsel specifically identified as missing—"the Affidavit of Separation submitted by the Rutherfordton Police Department in connection with Officer Page's termination," [Doc. 61-6 at 2]—from the Rutherfordton Police Department. [Doc. 61-1 at 7]. Nevertheless, the Plaintiff contends that the Commission also destroyed other documents—"the Commission's own correspondence, investigative actions, determinations, and any certifications or disciplinary proceedings that followed receipt of the F-5B"— that the Plaintiff cannot obtain from other sources. [Id.].

In its Response, the Commission contends, at length, that "there is no basis to reasonably conclude [that some or all of the requested records] ever existed." [Doc. 86 at 11]. The Commission specifically contends that while the "Plaintiff complains that investigation files regarding Defendant Page are not produced," there is "no evidence . . . that such investigative files ever existed," because there is no evidence that the Commission investigated the conduct leading to Defendant Page's separation from the Rutherfordton Police Department. [Id. at 7, 14].

The operative questions before the Court are whether the Commission had an obligation to preserve the purportedly destroyed records, whether such destruction was accompanied by a culpable state of mind, and whether the records were relevant to the Plaintiff's deliberate indifference claim, such that a reasonable factfinder could conclude that the records would have supported an element of the Plaintiff's claim. See Goodman, 632 F. Supp. 2d at 509 (articulating the elements for spoliation sanctions).

"The duty to preserve material evidence arises not only during litigation but also extends to that period before litigation when a party reasonably should know that the evidence may be relevant to the anticipated litigation." Silvestri, 271 F.3d at 591. The Plaintiff appears to contend that the Commission should have known to preserve the records because the

13

"Plaintiff began requesting information from State agencies in 2021" and "[t]here was news coverage and Plaintiff made public records requests and a plea for justice and transparency." [Doc. 61-1 at 16]. However, the Commission has never been a party to this action. Thus, the Plaintiff's requests for information and public pleas did not reasonably put the Commission on notice that it needed to preserve any files regarding Defendant Page, particularly ones that did not even concern the Decedent's accident. The Commission did not receive the Plaintiff's subpoena for the requested records until March 27, 2026. Nothing before the Court provides a basis for the Court to conclude that the requested records were destroyed after March 27, 2026, nor does anything before the Court provide a basis for the Court to conclude that, prior to the issuance of the Plaintiff's subpoena, the Commission reasonably should have known that the requested records would be relevant to anticipated litigation.

The Plaintiff also contends that the Commission had a statutory duty to preserve the requested records, [Doc. 61-1 at 11-14; Doc. 95 at 4-6], but the Plaintiff has failed to present any basis for the Court to conclude that the Commission failed to properly follow its routine retention schedule. See [Doc. 86 at 10 (explaining that the Commission was not required to retain files for officers like Defendant Page who had been separated from relevant

positions for more than three years)]; see also [Doc. 86-7 at 1 (discussing the relevant retention schedule)]. Thus, to the extent the Commission destroyed records pertaining to Defendant Page, it did not have a duty to preserve the records when they were destroyed. Moreover, because the Commission did not have a duty to preserve the records, any such destruction was not accompanied by a culpable state of mind.

As to the issue of relevance, the Plaintiff contends that the requested records would provide information about Defendant Page's "training in emergency medical response, his employment history, disciplinary record, and his prior conduct in similar situations." [Doc. 61-1 at 3]. The Plaintiff contends that such information is "directly relevant to establishing whether [Defendant Page's] failure to provide medical assistance constituted deliberate indifference" and "directly bears on what the Commission knew about Page's prior misconduct, what it did with that knowledge, and whether it took action affecting his re-certification." [Id. at 3-4, 22]. Specifically, the Plaintiff contends that the records implicate an element of the Plaintiff's deliberate indifference claim—namely, whether Defendant Page knew or should have known that the Decedent had a medical condition and that Defendant Page's action or inaction posed an unjustifiably high risk of harm to the Decedent. [Id. at 22-23]; see also Short v. Hartman, 87 F.4th 593, 611

(4th Cir. 2023) (stating the elements for a deliberate indifference claim). The Plaintiff has not, however, explained how the Commission's records, which exclusively concern Defendant Page's prior conduct and employment, could, in fact, bear on that inquiry. The Plaintiff's deliberate indifference claim stems from Deputy Page's alleged actions after the Decedent crashed his vehicle into a tree in 2021. Defendant Page's conduct and employment prior to 2021 are simply not relevant to his actions at the scene of the Decedent's collision, and the records in question would therefore have no bearing on the success or failure of the Plaintiff's deliberate indifference claim. Accordingly, the Court concludes that the Plaintiff has failed to establish the relevance of the records in question.

Because the Plaintiff has failed to establish any of the requisite elements for spoliation, the Court will deny the Plaintiff's motion for sanctions against the Commission.

### 2. Motion for Sanctions Against Page and Polk County

On May 19, 2026—fifteen days after the close of discovery in this case—the Plaintiff filed a motion for sanctions based on spoliation against Defendant Page and Polk County. [Doc. 68]. The Plaintiff's motion concerns the purported destruction of a wide range of items: (1) the event data recorders from the Decedent's vehicle and Defendant Page's vehicle, (2) the

Decedent's vehicle, (3) Defendant Page's vehicle, (4) in-car camera footage and body-worn camera footage of the Defendant Page's pursuit and initial approach to the vehicle, (5) Defendant Page's dispatch communications from the time of the incident, (6) the Polk County Sheriff's Office's internal investigation materials regarding the incident, (7) investigative crash files held by the North Carolina Department of Public Safety ("NCDPS") that pertain to prior accidents involving Defendant Page, and (8) law enforcement certification records held by the Commission.  [Doc. 68-1 at 3-8].

The operative questions before the Court are whether Defendant Page or Polk County had an obligation to preserve any of the purportedly destroyed items, whether any such destruction was accompanied by a culpable state of mind, and whether the items were relevant to the Plaintiff's deliberate indifference claim, such that a reasonable factfinder could conclude that the records would have supported an element of the Plaintiff's claim.  See Goodman, 632 F. Supp. 2d at 509 (articulating the elements for spoliation sanctions).

As to the event data recorders and the vehicles, the Plaintiff contends that they "would have provided objective, unimpeachable data about the pursuit—including speed, braking, and the dynamics of the collision—against which Page's self-serving written statement and deposition

testimony could have been evaluated." [Doc. 68-1 at 22-23]. Neither such data about the pursuit nor its potential inconsistency with Defendant Page's testimony about the pursuit, however, is relevant to Defendant Page's actions *after* the Decedent's collision, and the Court has previously concluded that only those actions are relevant to the Plaintiff's deliberate indifference claim. [Doc. 14 at 10]. Accordingly, no reasonable factfinder could conclude that the recorders or the vehicles would have supported the Plaintiff's claim.

In any event, as the Plaintiff concedes, the Decedent's event data recorder was "severely damaged" and "rendered unreadable because of the crash," so no data from the Decedent's recorder was recoverable in the first place. [Doc. 68-1 at 3]. Moreover, the Plaintiff never requested to review or inspect Defendant Page's car or the event data recorder. [Doc. 89 at 6; Doc. 99 at 8]. Defendant Page and Polk County cannot be sanctioned for failing to produce discovery which the Plaintiff never sought. Accordingly, for all these reasons, the Court will deny the Plaintiff's motion as to the event data recorders and the vehicles.

As for the in-car camera footage and body-worn camera footage of Defendant Page's pursuit and initial approach to the vehicle, it is undisputed that no such footage ever existed. [Doc. 68-1 at 5-6, 13-14]. Nevertheless,

the Plaintiff appears to seek sanctions for "institutional inaction" and "institutional failure" by Polk County that resulted in such footage never being created. [Id. at 5-6]. The Plaintiff's frustration with the circumstances that resulted in the absence of evidence, however, is not a basis for spoliation sanctions. Accordingly, the Court will deny the Plaintiff's motion as to the in-car and body-worn camera footage.

As to Defendant Page's dispatch communications, Defendant Page and Polk County represent that they produced the entirety of the communications. [Doc. 89 at 8]. The Plaintiff admits that one audio record of the communications was produced but contends that additional audio existed and must therefore have been destroyed. [Doc. 68-1 at 6-7, 14-15; Doc. 99 at 9-10]. To support his contention that additional audio existed, the Plaintiff argues that certain deposition testimony about the communications is not wholly consistent with the audio record that was produced. [Doc. 68-1 at 14-15; Doc. 99 at 10]. The Plaintiff's dissatisfaction with the purported inconsistency between certain deposition testimony regarding the audio record and the audio record itself, however, is not a sufficient basis for the Court to infer that there were additional audio records that were destroyed by Polk County or Defendant Page. Accordingly, the Court will deny the Plaintiff's motion as to the dispatch communications.

Similarly, as to the Polk County Sheriff's Office's internal investigation materials, Defendant Page and Polk County represent that they produced the entirety of the materials, which consisted of a single page. [Doc. 89 at 8-9]. The Plaintiff does not dispute that the single page was produced but contends instead that there should have been additional materials created in the course of the internal investigation. [Doc. 68-1 at 7, 15-16; Doc. 99 at 10-11]. The Plaintiff's dissatisfaction with the thoroughness of the documentation of the internal investigation, however, is not a sufficient basis for the Court to infer that there were additional materials that were destroyed by Polk County or Defendant Page. Accordingly, the Court will deny the Plaintiff's motion as to the Polk County Sheriff's Office's internal investigation materials.

As to the NCDPS and Commission records, Defendant Page and Polk County contend that they cannot be held responsible for such records because they never had those records in their possession. [Doc. 89 at 10]. The Plaintiff does not dispute this in his Reply and states only that the NCDPS and Commission documents were "a very minor aspect of Plaintiff's motion to show the magnitude and scope of the documents missing in this one case." [Doc. 99 at 11]. Because the Plaintiff does not dispute that such records were held by other entities and not destroyed by Defendant Page or

20

Polk County, the Court will deny the Plaintiff's motion as to the NCDPS and Commission records.

Accordingly, because none of the grounds asserted by the Plaintiff offer a tenable basis for sanctions against Defendant Page or Polk County, the Court will deny the Plaintiff's motion for sanctions against them. Because the Court will deny both of the Plaintiff's motions for sanctions, the Court further concludes that neither motion poses an obstacle to disposition of the Defendant's motion for summary judgment.

## B. Motion for Summary Judgment

The only remaining claim in this matter is the Plaintiff's claim for deliberate indifference. To establish deliberate indifference, the Plaintiff must show (1) that the Decedent "had a medical condition or injury that posed a substantial risk of serious harm," (2) that Defendant Page "intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed," (3) that Defendant Page "knew or should have known (a) that the [Decedent] had that condition and (b) that [Defendant Page's] action or inaction posed an unjustifiably high risk of harm," and (4) that, "as a result, the [Decedent] was harmed." Short v. Hartman, 87 F.4th 593, 611 (4th Cir. 2023).

The Defendants contend that the Plaintiff's deliberate indifference claim must fail because there is no forecast of evidence that the Decedent survived the collision of his vehicle with a tree and was alive at the time of Defendant Page's alleged actions. The Plaintiff counters that "there is no undisputed evidence that [the Decedent] was 'obviously' dead" when Defendant Page approached the vehicle, and therefore summary judgment is inappropriate. [Doc. 90 at 22]. The Plaintiff, however, bears the burden of presenting a forecast of evidence as to this element. The mere absence of undisputed evidence to the contrary does not support an inference that the Decedent was alive. [Id.].

Nothing in the forecasts of evidence provides a reasonable basis for a non-speculative inference that the Decedent remained alive after the initial collision with the tree. As a result, any inference to establish the first element would necessarily be speculative. The absence of evidence that the Decedent was alive also negates the other elements of the Plaintiff's deliberate indifference claim, as the remaining elements presume that the Decedent had an addressable medical condition and could be further harmed by a failure to address the condition.

Moreover, even if the Decedent were alive when Defendant Page first approached the Decedent's vehicle, there is no forecast of evidence as to

what Defendant Page could have done to render material aid to the Decedent because of the manner in which the Decedent was trapped in his vehicle. The undisputed facts establish that, upon arriving at the scene of the collision, Defendant Page immediately notified his dispatch of the accident and the need to summon emergency services, as well as the likely presence of a fatality. [Doc. 105: Ex. 2. Ben Page Call to Dispatch]. Defendant Page then approached the Decedent's vehicle, visually assessed the Decedent and perceived him to be lifeless, and extinguished a fire on the Decedent's vehicle to mitigate further harm. [Doc. 91-1 at 108, 123]. Even if Defendant Page were negligent in his manner of assessing the Decedent, or acting to turn his attention to extinguishing the fire, negligence does not rise to the level of deliberate indifference.[5]

Accordingly, even if the Decedent survived the initial impact of his collision, there is no forecast of evidence on which a reasonable jury could find facts sufficient to conclude that Defendant Page intentionally, knowingly,

---

[5] The Plaintiff also contends that Defendant Page was deliberately indifferent because he "told his dispatch that the subject was dead" and thereby "encourage[ed] the downgrading of emergency services." [Doc. 90 at 24]. The Plaintiff's assertion that Defendant Page encouraged the downgrading of emergency services, however, has no support in the forecasts of evidence. The Plaintiff further contends that Defendant Page's failure to respond appropriately to the collision "never gave [the paramedic] a 'fair' chance to save [the Decedent]." [Doc. 90 at 24]. The paramedic who responded to the scene, however, testified in his deposition that the Decedent "was entrapped in every way" and that "[t]he car was so bad, [he] didn't have a way to actually access the patient . . . to get to his body." [Doc. 91-6 at 48].

or recklessly acted or failed to act to appropriately address the risk that the Decedent's condition posed, or that Defendant Page reasonably should have known that his actions or inaction posed the Decedent an unjustifiably high risk of harm. Moreover, because there is no evidence that Defendant Page could have materially aided the Decedent, there is no basis for an inference that his failure to attempt to render such aid to the Decedent caused the Decedent harm. The Plaintiff has therefore failed to forecast evidence sufficient for a reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, to find facts establishing any of the elements of the Plaintiff's deliberate indifference claim. The Plaintiff's deliberate indifference claim therefore fails as a matter of law.

Moreover, deliberate indifference only applies to a situation where the law enforcement officer has a person in custody. DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 199-200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."); Patten v. Nichols, 274 F.3d 829, 841 (4th Cir. 2001) ("[I]f there is no custodial relationship, then the state has no duty to protect."). Here, however, the relevant undisputed facts are simple: the Decedent was never in Defendant Page's custody. Prior to

24

the Decedent's collision with the tree, he was speeding away from Defendant Page; after the Decedent's collision with the tree, he was trapped in his vehicle. Defendant Page never attempted to arrest, restrain, or otherwise detain the Decedent, and the Decedent was pronounced dead at the scene before being extricated from his vehicle. See Waybright v. Frederick Cnty., MD, 528 F.3d 199, 207 (4th Cir. 2008) (characterizing a "custodial relationship" as a "circumscribed one," requiring a state actor's affirmative exercise of power to restrain an individual liberty through "[s]ome sort of confinement," such as "incarceration, institutionalization, or the like"); see also Cnty. of Sacramento v. Lewis, 523 U.S. 833, 851 (1998) (emphasizing "the markedly different circumstances of normal pretrial custody and high-speed law enforcement chases" to show why different standards apply in the distinct circumstances).

The Plaintiff contends that custody is established by Defendant Page's high-speed pursuit and by the fact that Defendant Page approached the Decedent's vehicle with his weapon drawn. [Doc. 90 at 18-19]. The Plaintiff's argument, however, is directly contrary to Supreme Court precedent. In Brower v. County of Inyo, 489 U.S. 593 (1989), the Court concluded that a Fourth Amendment seizure occurs "only when there is a governmental termination of freedom of movement *through means*

25

*intentionally applied*." Id. at 597. The Court considered a hypothetical wherein a "pursuing police car sought to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit; and though he was in fact stopped, he was stopped by a different means—his loss of control of his vehicle and the subsequent crash." Id. Under those circumstances, the Court concluded, there would be no Fourth Amendment seizure. Here, where Defendant Page pursued the Decedent and the Decedent lost control of his vehicle and crashed, there was no custody for purposes of the Fourteenth Amendment. Nor could Defendant Page's approach to the vehicle with his weapon drawn—especially in light of the fact that the Decedent was trapped in his vehicle—have given rise to a custodial relationship with the Decedent. Accordingly, because there was no custodial relationship, Defendant Page had no duty to protect the Decedent and could not be held liable for deliberate indifference to the Decedent's condition.[6]

---

[6] The Plaintiff contends that there is a disputed factual issue regarding whether the Decedent was in custody because of a communication to the Spartanburg County emergency medical services that the Decedent was in custody. [Doc. 90 at 9-10, 17-20]. The Plaintiff, however, has not presented a forecast of evidence that Defendant Page ever reported that the Decedent was in custody. Instead, the Plaintiff only points to inadmissible hearsay in deposition testimony and a report that a firefighter from the Cooley Springs Fire Department told a Spartanburg County paramedic that the Decedent was in custody. [Doc. 65-7 at 10; Doc. 91-4 at 5]. Moreover, the undisputed facts establish that the Decedent was never in custody, so any communication that the Decedent was in custody would have been in error. A mistaken report of custody is not sufficient to establish a genuine factual dispute regarding custody.

26

Finally, the Plaintiff also contends that Defendant Page created and caused the Decedent's predicament by chasing him, and, as a result, had an affirmative duty to provide medical care when the "attempted apprehension" came to an end. [Doc. 90 at 16]. Under the state-created danger doctrine, "a state actor may be held liable for harm resulting from 'affirmative actions' that created or enhanced the dangerous conditions that produced the plaintiff's injury." Turner v. Thomas, 930 F.3d 640, 645 (4th Cir. 2019) (quoting Pinder v. Johnson, 54 F.3d 1169, 1175 (4th Cir. 1995)). This doctrine, however, is "narrowly drawn, and the bar for what constitutes an 'affirmative act' is high." Id. (quoting Pinder, 54 F.3d at 1175). Such affirmative acts must be "immediate interactions" between the state actor and the individual that are the "direct cause" of the individual's injuries. Callahan v. N. Carolina Dep't of Pub. Safety, 18 F.4th 142, 147-48 (4th Cir. 2021). Here, the relevant undisputed facts, though tragic, are quite simple: the Decedent was speeding unlawfully, Defendant Page pursued him, and the Decedent crashed into a tree. There were no immediate interactions between Defendant Page and the Decedent, and Defendant Page's pursuit of the Decedent for speeding cannot reasonably be construed as the direct cause of the Decedent's injuries. See Cnty. of Sacramento, 523 U.S. at 854 ("[W]e hold that high-speed chases with no intent to harm suspects physically

27

or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressable by an action under § 1983.").  Additionally, there is no forecast of evidence that Defendant Page "took any action to push the pursuit to extreme speeds"; rather, the forecast of evidence indicates that the Decedent "engaged in a high-speed flight," and Defendant Page "simply reacted to keep up with him in light of his behavior."  Mathis v. Anderson Cnty., No. CV 8:22-234-DCC-KFM, 2024 WL 4486601, at *13 (D.S.C. May 29, 2024), report and recommendation adopted, No. 8:22-CV-00234-DCC, 2024 WL 4024019 (D.S.C. Sept. 3, 2024).  Defendant Page did "nothing to cause [the Decedent's] high-speed driving in the first place, nothing to excuse his flouting of the commonly understood law enforcement authority to control traffic, and nothing (beyond a refusal to call off the chase) to encourage him to race . . . at breakneck speed."  Cnty. of Sacramento, 523 U.S. at 855.  Accordingly, the state-created danger doctrine has no application here.[7]

---

[7] The Fourth Circuit has repeatedly noted that it has "never issued a published opinion recognizing a successful state-created danger claim."  Burns-Fisher v. Romero-Lehrer, 57 F.4th 421, 425 (4th Cir. 2023); see also Callahan, 18 F.4th at 147; Turner, 930 F.3d at 646.  Moreover, "apart from situations involving custody, the Supreme Court has never applied a 'deliberate indifference' standard merely because the State created a danger that resulted in harm."  Slaughter v. Mayor & City Council of Balt., 682 F.3d 317, 321 (4th Cir. 2012).  As a result, a successful state-created danger claim would likely require conduct that is not merely deliberately indifferent but that "shocks the conscience."  Id.; see also Cnty. of Sacramento, 523 U.S. at 847-55 (1998) (applying the "shocks the

The Court concludes that the Plaintiff's deliberate indifference claim fails as a matter of law. The Court further concludes that, because the Decedent was never in custody and Defendant Page did not create the danger to the Decedent, the Decedent had no affirmative right to governmental aid, and Defendant Page's failure to render any such aid was therefore not a constitutional violation. Based on the forecasts of evidence, taken in the light most favorable to the Plaintiff, no reasonable jury could find facts to support any different conclusion. The Court will therefore grant summary judgment in favor of Defendant Page.[8]

The Court also notes that there is no claim pending against Defendant Auto-Owners Insurance Company, which has remained in this case only as the surety on Defendant Page's bond. [Doc. 23 at ¶¶ 12-14]. Because the Court has concluded that Defendant Page is entitled to summary judgment, the Plaintiff's remaining claims against him will be dismissed. Accordingly, the Court will also dismiss Defendant Auto-Owners Insurance Company from this case.

---

conscience" standard). The Plaintiff, however, has forecast no evidence of conscience-shocking conduct by Defendant Page.

[8] Because the Court has disposed of the Plaintiff's deliberate indifference claim on the merits and concluded that Defendant Page did not violate the Decedent's constitutional rights, the Court concludes that Defendant Page is also entitled to summary judgment based on qualified immunity. See Pearson v. Callahan, 555 U.S. 223, 236 (2009).

29

**C.    Order to Show Cause**

On June 3, 2026, the Court directed counsel for the Plaintiff to show cause in writing as to why she should not be sanctioned for failure to comply with the Court's Standing Order Regarding the Use of Artificial Intelligence. [Doc. 98 at 15].  The Court specifically directed counsel for the Plaintiff to explain both the origin of the fabricated quotations in briefing she filed with the Court and her repeated failure to provide timely certifications that complied with the Court's Standing Order.  [Id. at 10].

On June 9, 2026, counsel for the Plaintiff filed a "Letter to the Court about Artificial Intelligence" in response to the Court's Show Cause Order. [Doc. 106].  Regarding the failure to file proper certifications, counsel for the Plaintiff apologized to the Court and attributed the failure to an "inadvertent mistake."  [Id. at 2].  Counsel represented that she "does not use AI to conduct legal research," and that "[t]o ensure the accuracy of citations . . . [she] runs briefs through LexisNexis brief analysis" and fixes any error that appears "alarming."  [Id.].  Counsel further represented that she "has AI embedded in her practice" but that her "AI program cannot conduct research and cannot hallucinate."  [Id. at 3].  Regarding the fabricated quotations, counsel for the Plaintiff says that she "must be the origin," that "she made the errors, accepts full responsibility, attempted to properly verify her work

30

and fell short," and that "AI cannot be blamed." [Id. at 3-4]. Counsel also represents that she has now "made changes to her practice" and "has added additional time to more thoroughly vet her work." [Id. at 4].

The Court is deeply troubled by the errors previously identified in the Plaintiff's filings, and counsel's letter does little to allay the Court's concerns. Counsel indicates that she relies on a LexisNexis program for citation verification rather than having an attorney, or a paralegal working at an attorney's direction, verify citations as required by the Court's Standing Order. Moreover, counsel has not explained the origin of the fabricated quotations other than to accept responsibility for them and assert that they were not produced by an artificial intelligence program. How such fabricated quotations could have appeared in the Plaintiff's filings at all therefore remains a mystery. Finally, while counsel asserts that the artificial intelligence program embedded in her practice cannot hallucinate, she has provided no corroboration for that assertion, nor has she even provided the name of the artificial intelligence program that she uses. As a result, the Court finds that counsel's response has fallen well short of the Court's expectations. Nevertheless, because counsel has accepted responsibility for the errors in the Plaintiff's filings, the Court will discharge the Show Cause

31

Order.  Counsel for the Plaintiff is cautioned, however, that any similar shortcomings in future filings will result in sanctions.

## V.     CONCLUSION

Because there is no forecast of evidence sufficient to support a reasonable jury's determination that Defendant Page was deliberately indifferent to the Decedent's medical needs, the Court will grant summary judgment in favor of the Defendants.  The Plaintiff's claims for deliberate indifference and punitive damages will therefore be dismissed.


## O R D E R

**IT IS, THEREFORE, ORDERED** that the Plaintiff's Motion for Sanctions Against Non-Party North Carolina Criminal Justice Education and Training Standards Commission and for Fees for Destruction of Evidence [Doc. 61] is hereby **DENIED**.

**IT IS FURTHER ORDERED** that the Plaintiff's Motion for Sanctions Against Polk County and Ben Page and for Fees for Destruction of Evidence [Doc. 68] is hereby **DENIED**.

**IT IS FURTHER ORDERED** that the Defendants' Motion for Summary Judgment [Doc. 64] is **GRANTED**, and all the Plaintiff's remaining claims are hereby **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that the Court's Order to Show Cause [Doc. 98] is hereby **DISCHARGED**.

A Judgment consistent with the Memorandum of Decision and Order shall be entered contemporaneously herewith.

The Clerk is respectfully requested to close this civil case.

**IT IS SO ORDERED**.

Signed: August 7, 2026

Martin Reidinger
Chief United States District Judge

33